**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**DAVID T. LONG, et al.,**

       **Plaintiffs,**

          **v.**                                 **Civil Action No.  02-1374 (JDB)**

**HOWARD UNIVERSITY,**

       **Defendant.**

---

**MEMORANDUM OPINION**

Plaintiffs' motion for partial summary judgment in this disability-discrimination action asks the Court to conclude that it was unreasonable as a matter of law for defendant Howard University to refuse to relax certain doctoral degree requirements as an accommodation for limitations caused by a student's medical condition.  The motion further seeks a finding that defendant's refusal to do so constituted an unjustified breach of its contractual obligations to the student.  Because the Court cannot reach either conclusion without resolving genuine factual disputes, it will deny plaintiffs' motion.

**BACKGROUND**

In September 1982, plaintiff David Long entered the doctoral (or "Ph.D.") program in physiology at Howard University in Washington, D.C.  Pls.' Stmt. of Undisputed Material Facts (hereinafter "Pls.' Stmt.") ¶ 2; Def.'s Stmt. of Material Facts (hereinafter "Def.'s Stmt.") ¶ 60.  By November 1985, Long had completed the seventy-two credit hours of graduate-level coursework that he needed for the degree, had passed the requisite written tests for those courses, and had

successfully finished his oral comprehensive examination -- thereby becoming eligible for Ph.D. candidacy.  See Pls.' Stmt. ¶ 2; Def.'s Stmt. ¶¶ 14, 64, 67-68.  Once eligible for candidacy, Long still needed to obtain approval from the Department of Physiology and Biophysics for a research proposal and then needed to conduct the research, produce a written dissertation on the approved research topic, and defend the dissertation before a faculty committee.  See Def.'s Stmt. ¶¶ 30, 32-33, 40-43.  Long received approval in May 1989 for his proposed research on "Hormonal Regulation of Pepsinogen Secretion," and in November 1989 -- four years after completing his coursework and seven years after he first entered the Ph.D. program -- he was formally admitted as a Ph.D. candidate.  Pls.' Stmt ¶ 3; Def.'s Stmt. ¶¶ 73-74.

　　　　Howard maintains several time-to-degree policies for its doctoral programs.  A Ph.D. candidacy at Howard is valid for only five years, Def.'s Stmt. ¶ 34, and the school further imposes a course-viability rule, which treats as expired any course credit that was earned more than seven years prior to the student's dissertation defense, id. at ¶¶ 18-19.  The course-viability rule, however, is subject to an exception whereby a student may, with approval from his department's faculty chairman, seek to "restore" credit for courses taken more than seven years (but less than ten years) prior to his dissertation defense.  Course restoration can be accomplished by retaking the class, by passing an exam in the field in which the course falls, or by writing a paper on the subject.  Id. at ¶¶ 19-20, 23-24.  According to Howard's academic rules for graduate programs, "[u]nder no circumstances ... [will] a student receive credit toward the degree for a course which the student pursued more than ten (10) years prior to the time the student presents himself or herself for ... final examination."  Id. at ¶ 24.  The course-viability and course-restoration rules are intended to ensure that Ph.D. candidates "possess[] current knowledge in the field."  Id. at ¶ 21.

By the time Long's Ph.D. candidacy had commenced in November 1989, the courses he had taken in his first semester of the program were about to expire under the seven-year course-viability rule, and the remainder of his course credits were due to expire within three years (at which point his earliest courses would begin to lose their eligibility for restoration).  In short, even with the benefit of the course-restoration rule, Long needed to complete and defend his dissertation by the end of 1992 in order to avoid having to repeat at least some coursework (notwithstanding that the Ph.D. candidacy itself was valid through November 1994).

Sometime in 1990, within a few months of Long's formal acceptance as a Ph.D. candidate, Long was diagnosed with pulmonary fibrosis, a respiratory ailment that permanently diminishes lung function and, as a result, impairs physical activity.  See Pls.' Stmt. ¶ 4.  Long first informed Howard of his illness in July 1990, through a letter from his treating physician to the then-chairman of the Department of Physiology and Biophysics, Laval Cothran.  Def.'s Stmt. ¶ 78.  The letter stated that Long had a lung disease, that he was responding to medication, and that he would return to the department "shortly."  Id.  Long did resume his research and writing activities in 1990, and in October of that year Long submitted a draft of his dissertation to his adviser, George Littleton, who reviewed the document and gave Long suggestions for revisions.  Id. at ¶ 79.

Several months later, in January 1991, Long informed Howard that his illness had worsened.  Id. at ¶ 80.  In response, the director of graduate studies, Felix Grissom, recommended to Long that he take a leave of absence for the spring semester.  Id. at ¶ 81.[1]  The parties disagree about precisely what conditions, if any, Howard imposed on Long with respect to the leave, but

---

[1] At that point, all of Long's courses from 1982 and 1983 were expired (but still eligible for restoration), pursuant to the seven-year course-viability rule.

Howard asserts that it expected Long would return to the doctoral program in the summer or fall of 1991.  Compare id. at ¶ 81-83 ("Dr. Cothran stated that Long 'indicated [that] he thought he could come back either in the summer or in the fall.'") with Pls.' Stmt. ¶ 6 ("Cothran agreed to an open-ended medical leave of absence for Long and placed no time limit on when he could return. It was agreed that Mr. Long would be able to return at the same student status and complete his program from the point where he left off.") (internal citations omitted).

On February 25, 1992, Long wrote to Dr. Cothran, the department chairman, to express his desire to return to the Ph.D. program that semester in order to complete and defend his dissertation.  Def.'s Stmt. ¶ 84.[2]  In response, Dr. Cothran set up a meeting for March 6, 1992, at which he, Long, Dr. Littleton, and another faculty member discussed Long's intentions to resume his studies.  Id. at ¶ 86.  Howard contends that the professors informed Long at this meeting that "he needed to finalize his draft dissertation with the advice and consent of his [adviser], present the dissertation to the committee, and obtain a date for his oral defense of his dissertation."  Id. The professors also told Long that he had to do some additional research, but Dr. Littleton subsequently agreed to waive that requirement, even though Long "did not conclude [the] research to [Littleton's] satisfaction,"  because Littleton did not want to "be punitive against somebody who was alleging to be suffering from ... an invasive illness."  Def.'s Opp'n, Ex. 19 at 42, ll. 8-15; Def's Stmt. ¶¶ 86-87.  The parties nevertheless disagree about how much additional work Long needed to do before the dissertation would be suitable for final submission and oral defense.  Compare

---

[2] Around the same time, Long and his wife (plaintiff Karen Long) filed a civil lawsuit against Howard in District of Columbia Superior Court, alleging that conditions in a university laboratory had caused David Long's lung disease.  Howard and the Longs settled that suit in December 1993.  See Pls.' Stmt. ¶ 12.

Def.'s Stmt. ¶¶ 89-90 ("According to Dr. Cothran, Long's March 1992 draft dissertation was incomplete. The first five pages of the document were missing and no data was in the dissertation. ...  The Physiology and Biophysics Department expected that Long would be done with his dissertation 'within a few months.'") with Pls.' Stmt. ¶ 9 ("Long's dissertation merely had to be typed into the proper format, incorporating the handwritten revisions penciled in by Dr. Littleton.").

Following the March 1992 meeting, another three years passed before Long again contacted Howard (in mid-1995) about returning to complete and defend the dissertation.  In the interim, Long's Ph.D. candidacy had lapsed and all of Long's credits for his core courses had expired and were no longer eligible for restoration pursuant to Howard's ten-year rule.  Def.'s Stmt. ¶ 94, 119.  From July 1995 through September 1995, Long sent letters to various academic officials at Howard requesting reinstatement as a graduate student and an opportunity to defend his dissertation. Pls.' Stmt. ¶ 16-17.  At least one of these letters asserted that Long was disabled, but Howard contends that Long did not specifically request any particular accommodation for his disability.  Def.'s Stmt. ¶ 99.  In November 1995, Long received a letter from the dean's office informing him that, if he wanted to pursue his Ph.D., he would have to reapply and, if accepted, would likely have to retake all of the required courses.  Id. at ¶ 100.

Another two-plus years passed without communication between Long and Howard.  Long did not submit an application for readmission between 1995 and 1998 and did not perform any research or academic study during that period.  Id. at ¶ 102.  For reasons not apparent in the record, Howard's dean wrote to Long in April 1998 to inform Long that he could be reinstated as a Ph.D. candidate if he agreed to retake the comprehensive exams on core courses and submit his

dissertation draft to the department committee so that it could evaluate whether his topic and research were still current.  Id. at ¶ 103.  If the committee found that the dissertation was still current, then Long would be allowed to pick up where he left off with the dissertation; if the department determined that the paper was obsolete, then Long would have to submit a new proposal.  Id.  Long never responded directly to that offer.  Id. at ¶ 106.

In June 1999, Long wrote to Howard's president and asked him to intercede by granting Long unconditional readmission as a disability-based accommodation.  Id. at ¶ 108.  The president declined to make any further exceptions to the school's academic policies and invited Long to reapply.  Id. at ¶ 109.  In November 1999, Long submitted a formal application for readmission, and Howard accepted him to the physiology doctoral program in February 2000, conditioned upon Long retaking all of the core course that had expired.  Id. at ¶ 112.  The Physiology and Biophysics Department insisted that Long would have to start over, not only because it believed the course-viability rules generally served an important purpose, but also because, in this particular instance, there had been a substantial transformation in the field of physiology since Long's tenure as a student.  Research techniques had undergone "a big change" during that time, and "the body of knowledge had so drastically changed" -- shifting in the mid-1990s from a pedagogical approach that focused on organ systems to one that emphasized cellular and molecular science --  that allowing Long to take equivalency exams "would not guarantee currency of knowledge."  See id. at ¶¶ 113-14.  Long, however, did not receive notification of the conditional acceptance because of an "administrative error and [a] change in staff in the Office of the Graduate School of Arts."  Id. at ¶ 116.

On July 9, 2002, plaintiffs filed this civil action, which accuses Howard of (1) violation of

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182(a), based on its refusal to permit Long to return to the Ph.D. program without penalty for his absence; (2) violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), based on the same conduct; (3) breach of contract; (4) intentional infliction of emotional distress; and (5) loss of consortium by Long's wife, Karen Long.  Following more than three years of discovery, on February 17, 2006, plaintiffs filed a motion for partial summary judgment on the disability-discrimination and contract claims, which Howard has opposed.  The Court has received and reviewed the parties' voluminous submissions and has given due consideration to their legal arguments.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere

existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the

absence of evidence proffered by the non-moving party, a moving party may succeed on summary

judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations

omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which

the jury could reasonably find for the [non-movant]."  Id. at 252.

## ANALYSIS

**I.      Disability Discrimination Claims**

Aside from certain variations in substantive coverage that are not relevant here, Title III of

the ADA and Section 504 of the Rehabilitation Act provide disabled individuals with essentially

identical protections against discrimination.  See Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir.

1999) ("Claims and defenses under the two statutes are virtually identical.").  Title III of the ADA

guarantees that "[n]o individual shall be discriminated against on the basis of disability in the full

and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations

of any place of public accommodation," 42 U.S.C. § 12182(a), which includes all "postgraduate

private schools, or other places of education," 42 U.S.C. § 12181(7)(J).  Section 504 of the

Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a

disability ... shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance," 29 U.S.C. § 794(a), which includes any "college,

university, or other postsecondary institution" that accepts federal grants, 29 U.S.C. §

794(b)(2)(A).

Plaintiffs have alleged that Howard is liable under both of these anti-discrimination statutes, and Howard has conceded that it must comply with both laws because it is a "place of public accommodation" as well as a "program or activity receiving Federal financial assistance." In the interest of brevity and in recognition of the doctrinal overlap between the two statutes, the Court will refer only to plaintiffs' ADA claim, but will rely, where appropriate, on cases that construe the Rehabilitation Act as well.

Prohibited discrimination under the ADA includes "a failure to make reasonable modifications in policies, practices, or procedures" so as to accommodate the participation of individuals with disabilities.  42 U.S.C. § 12182(b)(2)(A)(ii).  A disabled individual, however, is not entitled to whatever modification he thinks might accommodate his limitations.  Nor is he entitled to obtain an advantage over his non-disabled peers.  Rather, the ADA mandates that places of public accommodation make only those reasonable modifications that are *necessary* to give a disabled individual the same opportunity to obtain the offered benefit that he would have had were it not for the limitations caused by his disability -- and, even then, only to the extent that the necessary modifications *would not fundamentally alter* the nature of that benefit.  See id. (stating that a failure to make reasonable modifications is actionable discrimination whenever "such modifications are necessary to afford ... goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless* the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations") (emphasis supplied).  The dispute between the parties in this case ultimately boils down to a single issue:  whether Howard's denial of Long's request to "come back [to the physiology doctoral program] at the same status" as when he left,

Pls.' Reply at 5, constitutes an unlawful refusal to make reasonable modifications in policies,

practices, or procedures.[3]

"[T]he determination of whether a particular modification is 'reasonable' involves a fact-

specific, case-by-case inquiry" that typically requires jury resolution.  See Staron v. McDonald's

Corp., 51 F.3d 353, 356 (2d Cir. 1995); see also Harnett v. Fielding Graduate Inst., 400 F. Supp.

2d 570, 577 (S.D.N.Y. 2005).  Thus, there is neither a rule of law that time-to-degree policies are

_____

[3] Of course, demonstrating that a defendant refused to make reasonable modifications to its policies, practices, or procedures is just one element of an ADA failure-to-accommodate claim.  A plaintiff making such a claim also must show: (1) that he is disabled, as defined by the statute; (2) that he sought a benefit from a covered program; and (3) that the program had notice of his disability and his desire for accommodation.  None of these additional elements, however, are truly in dispute here.  Although Howard's opposition to plaintiffs' motion contends that Long was not disabled, see Def.'s Opp'n at 8-11, Howard's own medical expert has agreed that Long's condition substantially limited his ability to walk and breathe, see Pls.' Mem. in Supp. of Mot. for Summ. J., Ex. G at 91-113 (Dep. of Jay Weiner, M.D.), and Howard does not dispute that walking and breathing are "major life activities" for purposes of determining disabled status under the ADA, see 42 U.S.C. § 12102(2)(A) (defining "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of [an] individual").  Howard's contention, then, is not that Long has no disability, but rather that limitations on walking and breathing do not necessitate the types of accommodations that Long demands.  Such arguments (which challenge the sufficiency of the correlation between a disability-based limitation and an accommodation), however, are properly viewed as part of the inquiry into the reasonableness of modifications, because they relate to whether the modifications are "necessary" for the plaintiff to obtain the benefit sought.  See 42 U.S.C. § 12182(b)(2)(A)(ii).  Similarly, Howard's arguments that Long was not "otherwise qualified" in 1995 to resume his studies at the point where he left off in 1991 -- because, among other things, he had not reapplied for admission, had not "restored" his expired courses, and had not completed his degree within the term of his Ph.D. candidacy, see Def.'s Opp'n at 4-8 -- also are more appropriately considered as relating to the reasonableness of requested modifications, rather than as part of an independent inquiry into Long's "qualifications." See Wynne v. Tufts Univ. Sch. of Med. ("Wynne I"), 932 F.2d 19, 27 (1st Cir. 1991) (explaining that "reasonable accommodation [is] part of the 'otherwise qualified' inquiry" for Rehabilitation Act claims); see also Alexander v. Choate, 469 U.S. 287, 299 n.19 (1985) ("[T]he question of who is 'otherwise qualified' and what actions constitute 'discrimination' under [the Rehabilitation Act] would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of the handicapped.").  What Howard seems to be saying in this regard is that at least some of the "qualifications" for pursuit of a doctoral degree are fundamental to the nature of the program.

always exempt from modification, nor one that requires a school to modify such policies

whenever a disabled student so requests.  See 34 C.F.R. § 104.44(a) ("Modifications [required by

the Rehabilitation Act for Department of Education grant recipients] *may* include changes in the

length of time permitted for the completion of degree requirements, substitution of specific

courses required for the completion of degree requirements, and adaptation of the manner in

which specific courses are conducted.") (emphasis supplied).  As the First Circuit has said,

"reasonableness is not a constant.  To the contrary, what is reasonable in a particular situation may

not be reasonable in a different situation -- even if the situational differences are relatively slight."

Wynne v. Tufts Univ. Sch. of Med. ("Wynne II"), 976 F.2d 791, 795 (1st Cir. 1992); see also

Wong v. Regents of the Univ. of Cal., 192 F.3d 807, 821 (9th Cir. 1999) ("We do not hold that

allowing [the plaintiff] to take eight weeks off between each of [his] third-year [medical school]

clerkships would have been a reasonable accommodation [for his learning disability]; in fact, we

recognize that a jury may well find that ... this modification to the school's curriculum was *not*

reasonable.") (emphasis supplied).

    In Howard's view -- a view the Court must adopt, so long as it has some modicum of

evidentiary support, for purposes of resolving the present motion for summary judgment -- the

university would have had to make the following policy modifications in order to permit Long to

resume his studies where he left off (that is, without regard to the time that had elapsed between

his departure in January 1991 and his request for reinstatement in mid-1995):  (1) waive the

requirement that students who are absent for a semester or longer formally apply for readmission,

(2) dispense with the ten-year course-viability rule as applied to the coursework Long completed

between 1982 and 1985 and never "restored," (3) waive the five-year time limitation on doctoral

candidacies, and (4) relax the requirement that doctoral dissertations reflect current knowledge of

the field and make a contribution to contemporary scholarship.  See Def.'s Opp'n at 5-8.[4]  Howard

contends that a jury, if it were to resolve disputed facts in Howard's favor, could readily conclude

that these modifications -- both individually and collectively -- are unreasonable, either because

that are not *necessary* to accommodate Long's disability-related limitations under the

circumstances, or because (even if they are necessary) they would *fundamentally alter* the nature

of the doctoral program.[5]  As the following discussion will demonstrate, the Court agrees that

there is ample evidence in the record to support a jury finding of unreasonableness, and hence will

deny plaintiffs' motion for summary judgment on the disability-discrimination claims.

### A.     Necessity

Howard contends that plaintiffs have failed to establish that any of the requested

modifications are reasonable as a matter of law because they have failed to demonstrate that

Long's disability (which limits his ability to walk and breathe) necessitated any modification at all

---

[4] In support of their motion for summary judgment, plaintiffs assert that Howard does not in fact enforce these requirements and that, even if Howard does enforce them as a general matter, it permits so many exceptions to the rules that any request for waiver is *per se* reasonable.  On plaintiffs' motion for summary judgment, however, the Court cannot accept the first contention as true because Howard has come forward with evidence that it does enforce the policies.  And, even if Howard were to concede the essential premise of plaintiffs' alternative contention -- that the prior exceptions Howard made to the ten-year course-viability rule are materially indistinguishable from the exception that Long seeks (something Howard assuredly does *not* concede) -- past practice alone, while probative of reasonableness, is not dispositive.  See Wong, 192 F.3d at 820 ("An institution's past decision to make a concession to a disabled individual does not obligate it to continue to grant that accommodation in the future, nor does it render the accommodation reasonable as a matter of law.").

[5] The burden of proving the necessity of modifications is allocated to the *plaintiff*, whereas the absence of fundamental alteration is presumed unless the *defendant* proves otherwise (i.e., demonstrates that the modifications, even if necessary, would result in a fundamental alteration in the benefit).

to Howard's academic policies.  In other words, as Howard sees it, a jury could conclude that none

of the requested modifications was "necessary to afford ... goods, services, facilities, privileges,

advantages, or accommodations," 42 U.S.C. § 12182(b)(2)(A)(ii), to Long under the

circumstances because -- even assuming that Long was substantially impaired in his ability to

walk and breathe between 1991 and 1995 -- Long's physical impairments did not prevent him

from completing his dissertation for that entire period.  Indeed, as Howard points out, plaintiffs

have acknowledged that "Long's condition had stabilized by 1994 to the point where Long was

capable of defending his dissertation and performing those tasks associated with a career in

academics (reading, preparing research papers, talking on the telephone)."  Pls.' Mem. in Supp. of

Mot. for Summ. J. at 8.  Moreover, Howard's medical expert asserts that Long "could read, write,

and prepare research papers ... as early as 1993 or 1994."  Def.'s Opp'n at 10 (citing Pls.' Mem. in

Supp. of Mot. for Summ. J., Ex. G at 99-101 (Dep. of Jay Weiner, M.D.)).  Thus, to the extent

that any of the modifications were needed only *after* Long had again become "capable of

defending his dissertation and performing those tasks associated with a career in academics,"

Howard asserts, those modifications cannot be treated as "necessary" for purposes of the ADA

claim.

   Although, as noted above, Howard frames this challenge as a dispute over whether Long

was disabled, the Court construes the argument as calling into question the sufficiency of the

correlation between Long's disability and the requested accommodations.  Other courts have

recognized the need for such a correlation.  For example, in Amir v. Saint Louis University, a

disability-discrimination case brought by a medical student, the Eighth Circuit upheld summary

judgment for the school on the ground that the student's request to be assigned to a different

-13-

clinical supervisor was in no way related to accommodating his obsessive compulsive disorder and therefore "was not a reasonable accommodation under the ADA." 184 F.3d 1017, 1029 (8th Cir. 1999). Similarly, in a case involving alleged disability discrimination in employment, the Eighth Circuit said that "[t]here must be a causal connection between the major life activity that is limited and the [need for] accommodation sought." Wood v. Crown Redi-Mix, Inc., 339 F.3d 682, 687 (8th Cir. 2003). The Second Circuit likewise has concluded that there must be a causal link between a disability-based limitation and an accommodation. See Felix v. New York City Transit Auth., 324 F.3d 102, 105 (2d Cir. 2003) ("Although 'discriminate' is defined in very broad terms, that expansive definition does not change the requirement that to be actionable [under the ADA] the discrimination must be 'because of the disability.'"). Put slightly differently, the ADA requires only that covered entities "reasonably accommodate *limitations*, not disabilities," Taylor v. Principal Finan. Group, Inc., 93 F.3d 155, 164 (5th Cir. 1996) (emphasis supplied); it is the limitation arising from the disability that determines the need for accommodation, not merely the existence of the disability.

In this case, Howard was required to make modifications for Long -- if at all -- only insofar as its policies and practices failed adequately to take account of limitations on walking and breathing. Howard contends that the record would support a jury finding that Long's need for modification to the policies in question stemmed not from any respiratory limitation, but rather from Long's allegedly shiftless nature. By presenting evidence of an arguably tenuous relationship between Long's disability and his asserted need for additional time to complete his Ph.D., Howard has successfully shown that there is a genuine issue between the parties as to whether the modifications sought were made necessary because of the limitations created by Long's disability.

Hence, the Court is precluded from finding that the modifications are reasonable as a matter of law and must deny plaintiffs' motion for summary judgment on the disability-discrimination claims for that reason.

> B.    Fundamental alteration

Plaintiffs' motion for summary judgment on the disability-discrimination claims also fails for a separate reason.  That is because Howard has come forward with evidence that, if believed by a jury, would establish that "making such modifications would fundamentally alter the nature" of the doctoral program -- thus rendering the modifications unreasonable as a matter of law, even if they were "necessary" for Long's equal participation in the program.  See 42 U.S.C. § 12182(b)(2)(A)(ii).

The contradistinction between program modifications that are "reasonable" and those that are "fundamental" (or "substantial") has long been recognized in disability-discrimination law. See, e.g., Alexander v. Choate, 469 U.S. 287, 295 (1985) ("[W]hile a grantee [covered by the Rehabilitation Act] need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones.").  The ADA incorporates this dichotomy when it defines discrimination to include "a failure to make reasonable modifications in policies, practices, or procedures ... *unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the] goods, services, facilities, privileges, advantages, or accommodations*."  42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis supplied).  As explained above -- and as the statutory text clearly states -- the burden of proving a fundamental alteration rests with the defendant.

In this case, Howard argues that providing Long with the waivers Howard says he would

need to resume his studies where he left off in 1991 would fundamentally alter the physiology

doctoral program by undermining its academic integrity and prestige in the field, thereby lessening

the value of degrees.  See generally Mershon v. St. Louis Univ., 442 F.3d 1069, 1076 (8th Cir.

2006) ("An educational institution is not required by the Rehabilitation Act or the ADA to lower

its academic standards for a professional degree.").  Responding to plaintiffs' interrogatories,

Howard stated:

> a precedent of lowering the standards [for a Ph.D.] may negatively affect the accreditation
> of the University as a nationally renowned University with recognition in the global
> community.  Any downgrading of the University's status in the global community will
> surely affect the recruitment of students and not attract world-class faculty to the
> institution.  The cost to the University may be in the form of lost revenue from tuition
> payments and the reduction of research grants, training grants, and contracts to the
> University.

Pls.' Mem. in Supp. of Mot. for Summ. J., Ex. I at 18-19 (Howard's Answers to Pls.' First Set of

Interrogatories).  Howard also has come forward with testimonial evidence that one of the

fundamental aspects of its doctoral degree program is the faculty's endorsement of the degree

recipient as a scholar who has satisfied rigorous academic standards and has made a substantial

academic contribution to the field -- and, therefore, that any relaxation of the underlying standards

alters the nature of that endorsement.  See Def.'s Opp'n, Ex. 32 at 178-79 (Dep. of Bernell

Coleman, Chairman of the Physiology and Biophysics Department at Howard University) (stating

that Howard faculty have an obligation to the public to ensure that a student is "totally prepared"

within his field of study before he receives a Ph.D.); Def.'s Opp'n, Ex. 6 at 179, ll. 7-13 (Dep. of

Dr. Cothran) ("[I]f [Howard] just extend[s] the limits for continuing a Ph.D. ad infinitum, then, I

think it would cost the University dearly in terms of its reputation and ability to seek funds and its

ability to attract highly-competent graduate students.").

Plaintiffs respond with evidence suggesting that Howard routinely waives some of the same requirements (most notably, the course-viability rule), and therefore plaintiffs contend that these standards cannot be deemed fundamental to the nature of the doctoral program. Specifically, plaintiffs have produced academic records of 127 former Howard graduate students (from various departments) who apparently received credit for courses taken more than ten years before they received their degrees.  See Pls.' Mem. in Supp. of Mot. for Summ. J., Ex. M.  But there is substantial disagreement about what this evidence reflects.  Howard contends that, in all 127 cases, the students -- unlike Long -- had utilized the credit-restoration process for the otherwise-expired courses.  See Def.'s Opp'n at 12-13.  Plaintiffs challenge the veracity of this contention by pointing out that the files of fifty-nine of the 127 students do not contain course-restoration forms.  See Pls.' Reply 13-14;  see also Pls.' Mem. in Supp. of Mot. for Summ. J., Ex. M, Nos. 2, 5-6, 9-11, 13, 15-16, 18-22, 24-25, 30, 32, 35-36, 42-45, 49, 54, 56-57, 59, 62, 70, 76-79, 81, 90, 92, 94-98, 100, 103, 107-09, 112, 114, 116-18, 120-22, 125, 127 (records without course-restoration forms).  Whatever the probative worth of this evidence might be, when it is viewed in the light most favorable to Howard, it is not great enough to remove any genuine issue as to whether Howard previously has made such modifications in similar circumstances -- let alone sufficient to overcome Howard's fundamental-alteration defense as a matter of law.  Indeed, Howard also asserts that all 127 of these students, unlike Long, completed their dissertations within their Ph.D. candidacy periods, see Def.'s Opp'n at 13, and Howard has produced testimony from Dr. Cothran that, of the fifty-two students who graduated with doctoral degrees from the Department of Physiology and Biophysics between 1964 and 2001, none took more than ten years to earn the Ph.D., see Def.'s Opp'n, Ex. 6 at 162-63.

In denying plaintiffs' motion for summary judgment on this ground, the Court finds only that defendant has produced sufficient evidence to create a genuine issue of material fact with respect to whether providing the requested policy modifications for Long would fundamentally alter the nature of the physiology doctoral program. Based on the evidence proffered by the parties thus far, whether the modifications would in fact constitute a fundamental alteration is a question requiring jury resolution.[6]

## II.    Breach of Contract Claim

Plaintiffs also have moved for summary judgment on their claim that Howard breached its contract with Long by preventing him from defending his dissertation and thereby earning his Ph.D. Plaintiffs have identified two potential contracts between Long and Howard: (1) the implied contractual relationship that allegedly was formed when Long enrolled as a student, see Basch v. The George Washington University, 370 A.2d 1364, 1366 (D.C. 1977) ("[T]he relationship between a university and its students is contractual in nature."), and (2) the implicit agreement that allegedly was created in early 1991 when Long accepted the offer of Howard's

---

[6] Were the Court faced with a *defense* motion for summary judgment, it might have had to decide what degree of deference (if any) is owed to an educational institution's conclusion that a policy is fundamental to the institution's academic integrity. See Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985) (holding that courts, when evaluating due-process claims that challenge "the substance of a genuinely academic decision," must "show great respect for [a] faculty's professional judgment ... unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment"); Zukle v. Regents of the Univ. of Cal., 166 F.3d 1041, 1047 (9th Cir. 1999) (relying on cases from the First, Second, and Fifth Circuits, as well as the reasoning of Ewing, to reach the conclusion "that an educational institution's academic decisions are entitled to deference" in the realm of ADA and Rehabilitation Act cases). But where, as here, *plaintiffs* are seeking summary judgment, the ordinary application of Rule 56 makes that decision unnecessary because the Court must assume the truth of defendant's factual assertions about the effects that policy modifications would have on its academic standing.

director of graduate studies to take a leave of absence for health reasons, <u>see</u> Def.'s Stmt. ¶ 81-83. The complaint asserts that Howard breached both agreements by wrongfully preventing or hindering Long from fulfilling his obligation under the contracts (i.e., his obligation to complete the requisite academic requirements for a Ph.D.).  Plaintiffs, however, cannot prevail on their motion for summary judgment for several reasons.

        First, Howard has asserted as an affirmative defense that the contract claims are barred by the applicable statute of limitations, which is three years in the District of Columbia.  <u>See</u> Answer at 6; D.C. Code § 12-301(7).  In this case, because plaintiffs filed suit on July 9, 2002, their breach-of-contract claim would be time-barred if the cause of action accrued before July 9, 1999. Although Howard does not develop this defense in its opposition to plaintiffs' motion -- other than to assert that "Long's claim for breach of contract appears to be barred by the statute of limitations," Def.'s Opp'n at 18 -- there is evidence in the record that could support a jury finding that plaintiffs had notice of the alleged breach at some point before that date, such as in November 1995, when Howard's dean sent Long a letter informing him that, if he wanted to pursue his Ph.D., he would have to reapply and, if accepted, would likely have to retake all of the required courses. <u>See</u> Def.'s Stmt. ¶ 100; <u>see also</u> <u>Bembery v. Dist. of Columbia</u>, 758 A.2d 518, 520 (D.C. 2000) ("As a general rule, an actionable claim accrues, and the statute of limitations begins to run, when a suit thereon could first be maintained to a successful conclusion.") (citation omitted).  Indeed, plaintiffs all but concede that there is a genuine issue with regard to the statute of limitations.  <u>See</u> Pls.' Reply at 20 (stating that "[p]laintiffs are unable to respond to Howard's statement that the breach of contract claim 'appears' to be barred by the statute of limitations without knowing the factual basis of such an assertion" and claiming that Howard "did not officially foreclose Long's

attempt to complete his degree until the March 9, 2004[,] letter from [the dean] formally denying

Long's request for reinstatement"); but see Pls.' Mem. in Supp. of Mot. for Summ. J. at 22 ("The

University has engaged in a continuous pattern of interference *since 1995* that has prevented or at

least substantially hindered Long's ability to perform his end of the contract.") (emphasis

supplied).

A second reason why the Court must deny plaintiffs' motion for summary judgment on the

contract claim is that there is a genuine issue about the precise terms of the alleged 1991

agreement regarding Long's leave of absence -- namely what the parties understood to be the time

frame for Long's return.  Compare Def.'s Stmt. ¶ 81-83 ("Dr. Cothran stated that Long 'indicated

[that] he thought he could come back either in the summer or in the fall [of 1991].'") with Pls.'

Stmt. ¶ 6 ("Cothran agreed to an open-ended medical leave of absence for Long and placed no

time limit on when he could return.  It was agreed that Mr. Long would be able to return at the

same student status and complete his program from the point where he left off.") (internal

citations omitted).

Third, with respect to the implied contract that allegedly was formed when Long enrolled

as a student at Howard, summary judgment on plaintiffs' claim of breach is foreclosed by the very

facts that plaintiffs allege in support of the disability-discrimination claims.  Plaintiffs contend

that the terms of this alleged agreement were that Howard would "award Long a Ph.D. upon the

successful completion of the academic requirements for the degree."  See Pls.' Mem. in Supp. of

Mot. for Summ. J. at 21.[7]  But by plaintiffs' own admission, Long required *modifications* of "the

---

[7] Presumably plaintiffs would acknowledge that this does not reflect the entirety of the
agreement as it says nothing, for example, about Long's obligation to pay tuition.

academic requirements for the degree" *because of his disability* -- at least insofar as the academic

requirements included the various time-to-degree limitations discussed above, which the Court

must assume to be the case.  What Long is suggesting is that one party to a contract may base a

breach-of-contract claim on the other party's refusal to relieve the first party of its contractual

obligations.  On the present facts, and in this procedural posture, that argument is simply

untenable.

**CONCLUSION**

For the foregoing reasons, and upon consideration of the entire record, the Court will deny

plaintiffs' motion for partial summary judgment.  A separate order has been issued herewith.


_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:   __July 17, 2006__


Copies to:

Harvey S. Williams
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009
Email: hsw@williamslegal.com

  *Counsel for plaintiffs*


Phillip A. Lattimore, III
OFFICE OF THE GENERAL COUNSEL OF HOWARD UNIVERSITY
2400 Sixth Street, NW, Suite 321
Washington, DC  20059
Email: plattimore@howard.edu

  *Counsel for defendant*